# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## 98 - 0003 CR-UNGARO-BENAGES

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | NO. _____ |
| | ) | |
| v. | ) MAGISTRATE JUDGE | 18 U.S.C. § 371 |
| | ) DUBE | 18 U.S.C. § 666 |
| | ) | 18 U.S.C. § 1343 |
| JAMES C. BURKE, | ) | 18 U.S.C. § 1346 |
| CALVIN B. GRIGSBY and | ) | 18 U.S.C. § 1956 |
| BILLY HARDEMON, | ) | 18 U.S.C. § 2 |
| Defendants. | ) | |
| _____ | / | |

**INDICTMENT**

The Grand Jury charges that:

**General Allegations:**

At all times relevant to this Indictment:

1.     Metropolitan Dade County ("County") was governed by a Board of Commissioners ("County Commission") comprised of 13 elected County Commissioners. The County Commission was the legislative and governing body of the County and was responsible for setting all policies under which the administrative officials functioned. The County's operations were managed on a daily basis by a County Manager, an individual appointed by and accountable to the County Commission. Among his other duties, the County Manager was responsible, along with the staff of the County Finance Department, for managing the County's budget, collecting revenues and paying County expenses.

2.     JAMES C. BURKE ("BURKE") was an elected member of the County Commission and Chairman of the Finance and Trust Funds Committee of the County



Commission ("Commission Finance Committee").  The Commission Finance Committee oversaw the activities of the County Finance Department and made recommendations to the County Commission as to all material financial matters requiring County Commission approval.

3.     The County paid for essential services and other ordinary costs  through the collection of taxes and other revenues.  Larger projects, such as the construction of public works and facilities, were frequently financed by borrowing money.  One method the County used for borrowing money was to issue bonds, obligating the County to repay the purchasers of the bonds within a stated period and to make periodic interest payments to the bond holders over the life of the bonds.  Generally, ordinances and other matters relating to the County's financing of its operations through the issuance of bonds were required to have been first considered and approved by the staff of the County Finance Department, by the County Manager's Finance Committee (a committee composed of staff members and financial advisors who reported to the County Manager) and by the Commission Finance Committee prior to being submitted to the County Commission for final approval.

4.     During calendar year 1996, the County, as an organization and government, received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance.

5.     BILLY HARDEMON ("HARDEMON") was the Chief Assistant on the Staff of County Commissioner BURKE until in or about mid-July, 1996, when he resigned to run for the office of  County Commissioner.

6.    CALVIN B. GRIGSBY ("GRIGSBY") was a principal owner of the firm Grigsby Brandford & Co., Inc. ("Grigsby Brandford"), which had its main office in San Francisco, California, and other offices in Miami and throughout the United States. As an underwriting firm, Grigsby Brandford was engaged in the business of assisting institutions, including local governments such as Dade County, in obtaining long-term financing through the issuance and marketing of bonds.

7.    GBR Financial Products, Inc. ("GBR") was partially owned by defendant GRIGSBY and was engaged primarily in the business of arranging with the issuers of bonds a sophisticated securities transaction called an interest rate SWAP contract. Such transactions were designed to reduce a bond issuer's interest payments. Through a SWAP contract, an issuer of bonds with a fixed interest rate obligation could obtain a lower variable rate on the debt, which interest rate could later increase or decrease over time depending on market conditions. GBR, as a SWAP provider, itself obtained significant profits on such transactions primarily through fees it charged and through the use of other sophisticated interest rate "hedging" transactions.

8.    Howard Gary was the principal owner of Howard Gary & Co., which had its offices in Miami, Florida. Howard Gary & Co., was also engaged in the business of underwriting bonds, and participated as an underwriter in a number of municipal bond offerings in South Florida. Beginning on or about July 2, 1996, Howard Gary cooperated in an on-going investigation then being conducted by the Federal Bureau of Investigation.

3

9.      The conduct of defendants BURKE and HARDEMON, while employed by Dade County, was governed by the Florida Code of Ethics and Florida Statutes, including Sections 112.313 and 112.3143, which in substance prohibited BURKE and HARDEMON from having any personal financial interest in the outcome of any official action taken by them and from receiving money for the performance of their official duties, except as permitted by ordinance, statute and regulations.

COUNTY BOND FINANCING

10.      Bonds are essentially a negotiable, or transferable, debt obligation sold by an issuer, such as a corporation or governmental entity, to investors, obligating the issuer to repay the investors over a specified period of time at a set interest rate.  The bonds are typically sold to investors at the time of their issuance by and through a team of underwriters.  These underwriters are compensated through their receipt of certain fees paid to them by the issuer as well as through their collection of what is essentially a sales commission from the proceeds of the sale of the bonds sold by them.

11.      The system used by the County for selecting the underwriters used in most bond issuances  involved the rotation of business among previously formed underwriting "teams." The system was adopted in an effort to distribute County underwriting business opportunities on a relatively equal basis over time among qualified firms.  By County regulation, each team of  underwriters was to be composed of a specified number of certain categories of underwriting firms including national underwriters and a certain number of  locally-based minority-owned firms.   Once the County Commission approved a public offering, the

4

underwriting team next eligible for assignment under the rotation system was authorized to proceed with the offering.

12.     By regulation, underwriters on a particular transaction under the County's rotation system were assigned the roles each would play in a transaction as well as the percentage of profits to be earned by each underwriter on a team with the overall goal of distributing the benefits of County underwriting business evenly to qualified firms over time. Generally speaking, the percentage of profits to be earned by each underwriter on the team in a particular transaction was based on the degree of administrative and sales responsibilities assumed by the team member.  A "Senior Manager" on an offering was the designated lead underwriter on a team, that is, the one with the greatest administrative responsibility for structuring, negotiating and implementing the public offering.  The Senior Manager typically also assumed the greatest responsibility for selling the bonds and had the highest profit potential on the offering.

DADE COUNTY GARBAGE
RECYCLING PROGRAM

13.     In approximately 1981, the County entered into an agreement with a company called Montenay-Dade, Ltd. ("Montenay"), to build, operate, manage and maintain a garbage recycling facility for the County.  As part of that agreement, the County was obligated to finance the construction of the recycling facility and to ensure a certain level of operating revenues sufficient to cover Montenay's expenses of operating the facility.  Periodically, the

5

County raised money through the issuance of bonds to pay for construction and operation of the facility.

14.     In or about 1995, the staff of the County Finance Department began considering proposals to refinance the Montenay bonds that had been issued previously in order to take advantage of more favorable interest rates and to relieve the County of certain restrictions and conditions it had agreed to when it issued the original bonds.  Ultimately, the proposed refinancing deal under consideration by April, 1996, involved the issuance of approximately $180,000,000 of new bonds to be used to pay off a portion of the bonds issued previously and a separate SWAP transaction that would occur at or about the time of the offering to further reduce the interest rate the County would have to pay on the debt.  The refinancing and SWAP transaction which were under consideration and ultimately approved, in July, 1996, by the County Commission, are collectively referred to herein as the "Montenay refinancing deal."

## CONSTRUCTION OF MIAMI SPORTS ARENA

15.     In or about April, 1996,  the Manager's Finance Committee also began considering the issuance of approximately $210,000,000 in bonds as part of the County's participation in the construction and operation of a new sports arena in Miami.  Under applicable County ordinances and regulations, the bond underwriting for the new Miami sports arena was to be awarded to the next team of underwriters eligible under the rotation system.

CONSPIRACY TO BRIBE
PUBLIC OFFICIALS

### COUNT ONE

1.     The allegations of the "General Allegations" section of this Indictment are hereby realleged and incorporated in this Count as if fully set forth herein.

2.     Beginning in or about February, 1996 and continuing through until at least September, 1996, the exact dates being unknown to the Grand Jury, in Miami, Metropolitan Dade County, in the Southern District of Florida, and elsewhere, the defendants,

### JAMES C. BURKE, CALVIN B. GRIGSBY,
### and BILLY HARDEMON,

did knowingly and intentionally combine, conspire, confederate and agree and reach an understanding with each other and with others, known and unknown to the Grand Jury, to commit offenses against the United States, that is, bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B) and (a)(2); money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and wire fraud; in violation of Title 18, United States Code, Sections 1343 and 1346.

### PURPOSES OF THE CONSPIRACY

3.     It was a purpose and object of the conspiracy for the defendants JAMES C. BURKE and BILLY HARDEMON to obtain money and promises of future payments, in the form of bribes, from defendant CALVIN B. GRIGSBY, by committing to use the powers of BURKE's office as County Commissioner and Chairman of the County Commission's Finance Committee and HARDEMON's office as Chief of Staff to Commissioner BURKE to advance

7

the economic and business interests of GRIGSBY in connection with several anticipated transactions involving the County, including (1) the Montenay refinancing deal and (2) the financing of the proposed new sports arena in Miami.

    4.    It was further a purpose and object of the conspiracy for the defendants BURKE, HARDEMON and GRIGSBY to engage in financial transactions using foreign banks and to employ funds placed in offshore accounts to carry out their unlawful schemes and to conceal and disguise the existence, nature, and scope of the schemes.

## MEANS AND METHODS OF THE CONSPIRATORS

    5.    Among the means and methods by which the defendants BURKE, HARDEMON and GRIGSBY, and their co-conspirators, would achieve the objects of the conspiracy were the following:

    A.    It was part of the conspiracy that defendant GRIGSBY would and did secretly promise to pay defendant BURKE at least $300,000 from GRIGSBY's profits as the principal underwriter and SWAP provider in the Montenay refinancing deal.

    B.    It was further part of the conspiracy that defendant GRIGSBY would and did secretly agree to pay to defendant HARDEMON the sum of $50,000 from GRIGSBY's profits as the principal underwriter and SWAP provider in the Montenay refinancing deal.

    C.    It was further part of the conspiracy that defendants BURKE and HARDEMON would and did, in exchange for these payments and promises of payments, agree to use and actually use their official positions to influence and pressure the County Finance

Department, the County Manager and the County Commission in connection with the proposed Montenay refinancing deal and the financing of the new Miami sports arena.

        D.      It was further part of the conspiracy that defendant GRIGSBY would and did cause to be paid to defendants BURKE and HARDEMON $50,000 in United States currency as an advance toward the amounts GRIGSBY had agreed to pay them and that he would and did use a secret Swiss bank account, as well as a bank in Bermuda, to make the payment.

## OVERT ACTS

6.     In furtherance of the conspiracy, and to accomplish its goals, at least one of the following overt acts, among others, was performed by at least one co-conspirator in the Southern District of Florida, and elsewhere, on or about the dates set forth below:

(1)     In or about February, 1996, defendants GRIGSBY, BURKE and HARDEMON met and agreed that GRIGSBY would pay BURKE and HARDEMON money to use their official positions to assist GRIGSBY and companies owned in part by GRIGSBY in connection with underwriting transactions involving the County, including but not limited to the Montenay refinancing deal and the Miami sports arena financing.

(2)     On or about March 25, 1996, defendant GRIGSBY caused to be submitted to County officials a written proposal regarding the Montenay refinancing deal.

(3)     On or about May 16, 1996, defendant BURKE at a meeting of the Commission Finance Committee  requested the County Attorney's Office to prepare a draft proposed ordinance modifying the system of rotation of underwriting teams in the County.

(4)     On or about May 21, 1996, Montenay wrote and delivered a letter stating that they were awarding the Montenay refinancing deal to Grigsby Brandford and Smith Barney as underwriters.

(5)     On or about June 4, 1996, defendant BURKE caused the County Commission to consider, and voted in favor of, an ordinance modifying the system of rotation of underwriting teams in the County giving the Manager's Finance Committee the ability to appoint a substitute member of an underwriting team if a member of the team to whom a deal would otherwise be assigned had a conflict of interest in participating in a transaction.

(6)     On or about June 18, 1996, defendant BURKE caused the County Commission to consider, and voted in favor of, a resolution concerning the composition of the underwriting team to be used in the new sports arena construction financing.

(7)     On or about June 18, 1996, defendant BURKE caused the County Commission to consider, and voted in favor of, an ordinance giving the Manager's Finance Committee the ability to appoint a substitute member of an underwriting team if a member of the team to whom a deal would otherwise be assigned had a conflict of interest in participating in the transaction.

(8)     On or about June 25, 1996, defendant HARDEMON attended a meeting of the Manager's Finance Committee and vigorously opposed a proposal to remove the underwriting team of which Grigsby Brandford was a member from consideration for selection as the underwriters of the financing for the construction of the new sports arena in Miami.

(9)     On or about June 28, 1996, Gary met with defendants GRIGSBY, BURKE and HARDEMON in a hotel in Orlando, Florida and discussed, among other things, the money to be paid to BURKE and HARDEMON by GRIGSBY for their assistance in connection with GRIGSBY's participation in the Montenay refinancing deal.

(10)    On or about July 2, 1996, the County Commission considered an ordinance authorizing the County to implement the Montenay refinancing deal. Defendant BURKE voted in favor of the ordinance.

(11)    On or about July 9, 1996, Gary and defendant BURKE met in Gary's office in Miami, Florida to discuss the Montenay refinancing deal and the payments BURKE expected to receive from GRIGSBY. At the meeting BURKE agreed to accept $100,000 from Gary to use BURKE's official position in protecting Gary as a participating underwriter in the Montenay refinancing deal and in other matters involving Gary's business with the County. At that time, BURKE accepted a $5,000 cash payment from Gary. BURKE also discussed efforts taken by him and by HARDEMON to further assist Grigsby Brandford in its efforts to have its underwriting team not lose the opportunity to participate in the new Miami sports arena financing deal due to conflicts of interest by other underwriting team members.

11

(12)    On July 10, 1996, the Commission Finance Committee considered and recommended for approval by the County Commission certain ordinances and resolutions necessary to implement the Montenay refinancing deal. Defendant BURKE voted in favor of the ordinances and resolutions.

(13)    On or about July 16, 1996, defendant BURKE called Gary and told him that another County Commissioner was raising objections to the Montenay  refinancing deal. BURKE told Gary that GRIGSBY was nervous about this and asked Gary to call the other County Commissioner to discuss the Commissioner's objections.

(14)    On or about July 18, 1996, Gary and defendant BURKE met at a Miami, Florida restaurant and discussed BURKE's plan to deposit the money BURKE was to receive from defendant GRIGSBY in offshore banks and further discussed other business opportunities involving GRIGSBY.

(15)    On or about July 18, 1996, the County Commission voted in favor of certain ordinances and resolutions  authorizing  the County to implement the Montenay refinancing deal and related operation and management agreements. Defendant BURKE voted in favor of all ordinances and resolutions related to the Montenay refinancing deal.

(16)    On or about July 24, 1996, defendant HARDEMON met with Gary in Gary's office and discussed the upcoming Montenay refinancing deal; HARDEMON's expected receipt of $50,000 from defendant GRIGSBY; the efforts of HARDEMON and defendant BURKE to ensure  GRIGSBY's participation in the Miami sports arena financing; and

12

HARDEMON'S intent to keep on top of the County staff to keep the Montenay refinancing deal on track.

(17)    On or about July 30, 1996, defendant BURKE met with and advised Gary that defendant GRIGSBY had told him that BURKE and defendant HARDEMON would be receiving an advance payment totaling $50,000 from GRIGSBY and that the payment would be coordinated by someone BURKE identified as the "African." BURKE and Gary made plans to travel to the Bahamas to open a bank account for BURKE to deposit a portion of the payments BURKE expected from GRIGSBY and Gary.

(18)    On or about August 2, 1996, defendant BURKE and Gary flew to the Bahamas and opened a bank account for BURKE, at which time an additional approximately $5,000 of the $100,000 to be paid by Gary to BURKE was deposited into the account.

(19)    On or about August 5, 1996, defendant BURKE told Gary in Miami, Florida that he had recently talked to the "African," whose name he provided to Gary as "Arnaud Labhouet," regarding the payment expected from defendant GRIGSBY.

(20)    On or about August 8, 1996, defendant BURKE told Gary that he was trying to secure for Grigsby Brandford a role in bonds to be issued by the County Expressway Authority.

(21)    On or about August 9, 1996, defendant BURKE spoke by telephone to defendant GRIGSBY in California about arrangements to pay BURKE.

(22)    On or about August 12, 1996, defendant GRIGSBY caused an agent of the Bank Privee Edmond de Rothschild in Geneva, Switzerland to wire transfer $50,000 from

13

GRIGSBY's account at the bank to the Bank of Bermuda.  GRIGSBY then contacted defendant BURKE to discuss the arrangements for disbursement of the money.

(23)    On or about August 12, 1996, defendant BURKE met Gary at Miami International Airport and advised Gary that defendant GRIGSBY had called him and asked whether BURKE had received any money.  BURKE advised that within a short time of telling GRIGSBY that he had not received any money, the Swiss banker contacted him and told him that there was $50,000 awaiting him at a specific bank in Bermuda.  After meeting with Gary, defendant BURKE flew to Bermuda.

(24)    On or about August 13, 1996, defendant BURKE received $49,750 in cash from the Bank of Bermuda in Bermuda which had been wire transferred from an account controlled by defendant GRIGSBY at the Bank Privee Edmond de Rothschild in Geneva, Switzerland. BURKE thereafter returned to Miami, Florida.

(25)    On or about August 13, 1996, defendant BURKE failed to disclose that he was carrying in excess of $10,000 in cash or monetary instruments on the U.S. Customs declaration form he presented to U.S. Customs agents as he departed Bermuda en route to Miami, Florida.

(26)    On or about August 14, 1996, defendant BURKE met with Gary in Miami, Florida  to discuss his receipt of $50,000 from defendant GRIGSBY in Bermuda, BURKE's payment of $25,000 of that amount to defendant HARDEMON, and BURKE's plan to travel with Gary to the Bahamas to deposit money.

(27)    On or about August 20, 1996, defendant BURKE  spoke with defendant GRIGSBY by telephone to discuss their meeting in Miami on August 24, 1996 to discuss profits to be made on the Montenay refinancing deal.

(28)    On or about August 21, 1996, defendant BURKE advised Gary that defendant GRIGSBY had asked BURKE to come to San Francisco to meet with him to discuss the Montenay  refinancing deal in anticipation of an August 26, 1996 meeting to determine the price for the bonds in the bond market and discussed traveling there with Gary.

(29)    On or about August 23, 1996, defendant BURKE met with Gary and discussed BURKE's recent efforts to persuade the County Manager and the staff of the County Finance Department to agree to a second interest rate SWAP transaction involving companies owned in part by defendant GRIGSBY, which would result in increased profits to GRIGSBY. BURKE further stated that he intended to buy a penthouse condominium in a development called Quayside in the Miami, Florida area and a condominium to use as an office in Atlanta and discussed the possibility that BURKE would give the money he received and would receive from GRIGSBY to Gary to hold in the name of a corporation which would purport to lend BURKE money to buy the real estate he  had selected.

(30)    On or about August 25, 1996, Gary met with defendants GRIGSBY and BURKE  in a hotel in San Francisco, California to discuss the Montenay refinancing deal and the profits which were expected to be made on the deal by the underwriters as well as the timing and amount of the payments from GRIGSBY to BURKE.

15

(31)   On or about August 26, 1996, defendant BURKE called the County Manager in Miami, Florida  from Grigsby Brandford's San Francisco, California offices and asked him to approve a payment of $600,000 by the County to Grigsby Brandford in the form of a "structuring fee," in addition to the other fees and expenses the County was expected to pay the underwriters of the Montenay refinancing deal.  BURKE also asked the staff of the County Finance Department and the County Manager to approve paying certain additional sums in connection with the Montenay bonds.

(32)   On or about August 27, 1996, in a telephone conversation between defendant BURKE in defendant GRIGSBY's office in San Francisco, California, and the County Manager and members of the County Finance Staff in Miami, Florida, BURKE again urged the County to agree to pay Grigsby Brandford a $600,000 structuring fee and to increase the County's other payments to the underwriters in connection with the Montenay refinancing deal.

(33)   On or about September 4, 1996, defendant BURKE called Gary and discussed with him the fact that he was preparing a letter to send to the County Manager again requesting that the County Manager approve the payment of a higher level of fees for the underwriters in connection with the Montenay refinancing deal.

(34)   On  or about September 7, 1996, defendant BURKE called Gary and left him a recorded message that he had talked to GRIGSBY and that he had obtained information from him about the profits to the underwriters on the Montenay refinancing deal and that he thought Gary would be happy.

All in violation of Title 18, United States Code, Section 371.

16

## BRIBERY OF A LOCAL OFFICIAL

### COUNT TWO

1.     The allegations of the "General Allegations" section of this Indictment are hereby realleged and incorporated in this Count as if fully set forth herein.

2.     Beginning in or about February, 1996 and continuing until at least in or about September, 1996, the exact dates being unknown to the Grand Jury, in Miami, Metropolitan Dade County, in the Southern District of Florida and elsewhere, the defendant,

### JAMES C. BURKE,

being an agent of Metropolitan Dade County, Florida, that is, a County Commissioner and Chairman of the County Finance and Trust Committee of the County Commission, did knowingly and corruptly agree to accept from CALVIN B. GRIGSBY something of value, that is, payments of at least $300,000, and accepted a partial payment of money from GRIGSBY, intending to be influenced and rewarded in connection with business, transactions and a series of transactions between the County and business entities owned and controlled by GRIGSBY involving a thing of value of $5,000 or more; in violation of Title 18, United States Code, Section 666(a)(1)(B).

## BRIBERY OF A LOCAL OFFICIAL

### COUNT THREE

1.     The allegations of the "General Allegations" section of this Indictment are hereby realleged and incorporated in this Count as if fully set forth herein.

17

2.    Beginning in or about March, 1996, and continuing until at least in or about September, 1996, the exact dates being unknown to the Grand Jury, in Miami, Metropolitan Dade County, in the Southern District of Florida and elsewhere, the defendant,

**BILLY HARDEMON,**

being an agent of Metropolitan Dade County, Florida, that is, the Chief of Staff to County Commissioner James C. Burke, did knowingly and corruptly agree to accept from CALVIN B. GRIGSBY something of value, that is, payments of at least $50,000, and accepted a partial payment of money from GRIGSBY, intending to be influenced and rewarded in connection with business, transactions and a series of transactions between the County and business entities controlled by GRIGSBY, involving a thing of value of $5,000 or more; in violation of Title 18, United States Code, Section 666(a)(1)(B).

## PAYING A BRIBE TO A LOCAL OFFICIAL

### COUNT FOUR

1.    The allegations of the "General Allegations" section of this Indictment are hereby realleged and incorporated in this Count as if fully set forth herein.

2.    Beginning in or about February, 1996, and continuing until at least in or about September, 1996, the exact dates being unknown to the Grand Jury, in Miami, Metropolitan Dade County, in the Southern District of Florida and elsewhere, the defendant,

**CALVIN B. GRIGSBY,**

did knowingly and corruptly give, offer and agree to give something of value to JAMES C. BURKE, that is, payments in an amount exceeding $300,000, including a partial payment of

18

$50,000, with the intent to influence and reward JAMES C. BURKE, an agent of Dade County, in connection with business, transactions and a series of transactions between Dade County and business entities owned and controlled by defendant GRIGSBY, involving a thing of value of $5,000 or more; in violation of Title 18, United States Code, Section 666(a)(2).

## PAYING A BRIBE TO A LOCAL OFFICIAL

### COUNT FIVE

1.     The allegations of the "General Allegations" section of this Indictment are hereby realleged and incorporated in this Count as if fully set forth herein.

2.     Beginning in or about February, 1996, and continuing until at least in or about September, 1996, the exact dates being unknown to the Grand Jury, in Miami, Metropolitan Dade County, in the Southern District of Florida and elsewhere, the defendant,

### CALVIN B. GRIGSBY,

did knowingly and corruptly give, offer and agree to give something of value to BILLY HARDEMON, that is, payments of at least $50,000, and did make a partial payment to HARDEMON, with the intent to influence and reward HARDEMON, an agent of Dade County, in connection with business, transactions and a series of transactions between Dade County and business entities owned and controlled by defendant GRIGSBY, involving a thing of value of $5,000 or more; in violation of Title 18, United States Code, Section 666(a)(2).

19

## BRIBERY OF A LOCAL OFFICIAL

### COUNT SIX

1.    The allegations of the "General Allegations" section of this Indictment are hereby realleged and incorporated in this Count as if fully set forth herein.

2.    Beginning in or about June, 1996 and continuing until at least in or about September, 1996, the exact dates being unknown to the Grand Jury, in Miami, Metropolitan Dade County, in the Southern District of Florida and elsewhere, the defendant,

### JAMES C. BURKE,

being an agent of Dade County, Florida, did knowingly and corruptly accept and agree to accept from Howard Gary, something of value, that is, payments totaling $100,000, including two partial payments totaling $10,000, intending to be influenced and rewarded in his official capacity in connection with business, transactions and a series of transactions between Dade County and various business entities controlled by Howard Gary, involving a thing of value of $5,000 or more; in violation of Title 18, United States Code, Section 666(a)(1)(B).

### THE SCHEME TO DEFRAUD THE PEOPLE
### OF METROPOLITAN DADE COUNTY, FLORIDA

### COUNTS SEVEN -- TEN

1.    The allegations of the "General Allegations" section of this Indictment are hereby realleged and incorporated in this Count as if fully set forth herein.

20

## **The Scheme**

2.      From at least February, 1996, the exact date being unknown to the Grand Jury, and continuing to at least September, 1996, within the Southern District of Florida and elsewhere, the defendants,

**JAMES C. BURKE,**
**CALVIN B. GRIGSBY and**
**BILLY HARDEMON,**

aided and abetted by others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice:

(A)      to deprive the citizens of Metropolitan Dade County, Florida, of their right to the fair and honest services of defendants BURKE as a Commissioner of Metropolitan Dade County and as the appointed Chairman of the Finance Committee of the County Commission, and HARDEMON as the Chief of Staff of Commissioner and Committee Chairman BURKE, performed free from deceit, fraud, dishonesty, favoritism, self-enrichment and self-dealing; and

(B)      to defraud the citizens of Metropolitan Dade County, Florida and individuals and businesses engaged in the business of municipal finance, and to obtain money and property for BURKE, HARDEMON and for GRIGSBY and entities owned and controlled by GRIGSBY over others, by means of false and fraudulent pretenses and representations, and by stealing and converting and misusing their official capacities.

21

## The Purpose of the Scheme

3.      The purpose of the scheme was for defendants BURKE and HARDEMON to obtain cash to which they were not otherwise entitled in the form of a reward for causing extremely profitable business involving the County to be awarded to defendant GRIGSBY and entities he owned and controlled without regard to the qualifications of and benefits to the County of the services which could have been provided by competitors of defendant GRIGSBY.

## The Manner and Means Used to Carry Out the Scheme.

Among the manner and means used to carry out the scheme were the following:

(1)      Beginning at least as early as February, 1996, defendants BURKE, HARDEMON and GRIGSBY reached an agreement whereby BURKE and HARDEMON would agree to take steps to secure for GRIGSBY and companies which GRIGSBY owned and controlled lucrative financing business  involving Dade County along with fees and other benefits from the County; and

(2)      Defendants GRIGSBY, BURKE and HARDEMON met in person, talked on the telephone and sent telefaxes and wire transfers to further the scheme.

## The Wire Transmissions in
## Furtherance of the Scheme

4.      On or about the dates listed below for each Count, within the Southern District of Florida and elsewhere, defendants BURKE, HARDEMON and GRIGSBY, for the purpose of executing and attempting to execute the scheme caused the following wire transmissions to

22

be made in interstate commerce by themselves or others; in violation of Title 18, United States Code, Sections 1343 and 1346 and 2:

| COUNT | Approx. Date | Wire Transmission |
|---|---|---|
| 7 | August 9, 1996 | Telephone call between BURKE in Miami, Florida and GRIGSBY in California to discuss  payments to BURKE. |
| 8 | August 20, 1996 | Telephone call between BURKE in Miami, Florida and GRIGSBY in California to arrange their meeting in Miami on August 24th to discuss profits to be made on Montenay recycling refinancing deal. |
| 9 | August 26 , 1996 | Telephone call from BURKE in GRIGSBY's offices in California to the County Manager in Miami, Florida to discuss BURKE's request for an additional $600,000 fee to be paid by the County to the underwriters on the Montenay refinancing deal. |
| 10 | August 27, 1996 | Telephone call from BURKE in GRIGSBY's offices in California to the County Manager and Finance Staff in Miami, Florida to discuss BURKE's request for additional monies to be paid by the County to the underwriters on the Montenay  refinancing deal. |

## MONEY LAUNDERING

### COUNT ELEVEN

1.     The allegations of the "General Allegations" section and paragraphs 1 to 34 of the Overt Acts alleged in Count One of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

2.     From on or about August 12, 1996 through on or about August 14, 1996, in Switzerland, the Commonwealth of Bermuda, and Miami, Metropolitan Dade County, in the

Southern District of Florida, and elsewhere, the defendants,

**JAMES C. BURKE, CALVIN B. GRIGSBY
and BILLY HARDEMON,**

did knowingly transport, transmit and transfer, and cause to be transported, transmitted and

transferred, $50,000 in United States currency to Miami, Florida, a place in the United States,

from and through Switzerland and the Commonwealth of Bermuda, places outside the United

States, with the intent to promote the carrying on of some form of specified unlawful activity,

that is, bribery and wire fraud; in violation of Title 18, United States Code, Section

1956(a)(2)(A) and Title 18, United States Code, Section 2.

## MONEY LAUNDERING

### COUNT TWELVE

1.      The allegations of the "General Allegations" section and paragraphs 1 to 34 of

the Overt Acts alleged in Count One of this Indictment are realleged and incorporated by

reference in this Court as if fully set forth herein.

2.      On or about August 2, 1996 in the Commonwealth of the Bahamas, and Miami,

Metropolitan Dade County, in the Southern District of Florida, and elsewhere, the defendant,

### JAMES BURKE,

did knowingly transport, transmit and transfer and cause to be transported, transmitted and

transferred $5,000 in United States currency from Miami, Florida, a place in the United States,

to and through Nassau, Bahamas, a place outside the United States, with the intent to promote

the carrying on some form of unlawful activity, that is, the acceptance and agreement to accept

24

a bribe from Howard Gary;  in violation of Title 18, United States Code, Section 1956

(a)(2)(A) and Title 18, United States Code, Section 2.

A True Bill.

_____
Foreperson

_____
THOMAS E. SCOTT
UNITED STATES ATTORNEY

_____
MARY K. BUTLER
ASSISTANT UNITED STATES ATTORNEY

_____
ALLAN J. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**UNITED STATES OF AMERICA**

98-0003 CR-UNGARO-BENAGES

v.

JAMES BURKE, ET AL.

**CERTIFICATE OF TRIAL ATTORNEY***

**Court Division:** (Select One)

| | |
|---|---|
| x  Miami | ___ Key West |
| ___ FTL | ___ WPB ___ FTP |

**Related Case Information:**
SUPERSEDING            Yes ___   No x
New Defendant(s)        Yes ___   No ___
Number of New Defendants   MAGISTRATE JUDGE
Total number of counts            DUBÉ

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:      (Yes or No) ___No___
     List language and/or dialect

4.   This case will take _16-20_ days for the parties to try.

5.   Please check appropriate category and type of offense listed below:
     (Check only one)                              (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I   | 0 to 5 days | ___ | Petty | ___ |
| II  | 6 to 10 days | ___ | Minor | ___ |
| III | 11 to 20 days | x | Misdem. | ___ |
| IV  | 21 to 60 days | ___ | Felony | ___ |
| V   | 61 days and over | ___ | | |

6.   Has this case been previously filed in this District Court? (Yes or No) ___No___
If yes:

Judge: _____     Case No. _____
(Attach copy of dispositive order)

Has a complaint been filed in this matter? (Yes or No) ___No___
If yes:

Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____     District of _____

7.   This case originated in the U.S. Attorney's office prior to August 16, 1985
     (Yes or No) ___No___

_Mary K Butler_

Mary K. Butler, Ct. ID. # A5500082
Allan J. Sullivan, Ct. ID. # A5500062

*Penalty Sheet(s) attached

**UNITED STATES DISTRI . COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**PENALTY SHEET\***

98 - 000 3 CR-UNGARO-BENAGES

Defendant Name: ___James Burke___        Case No.: _____

**MAGISTRATE JUDGE**
**DUBÉ**

Count #: 1

18 USC § 371, Bribery and money laundering conspiracy

Max. Penalty: __5 years' imprisonment; $250,000 fine__

=================================================================

Count #: 2

18 USC § 666(a)(1)(B), Bribery

Max. Penalty: __10 years' imprisonment; $250,000 fine__

=================================================================

Count #:6

18 USC §666(a)(1)(B), Bribery

Max. Penalty: __10 years' imprisonment; $250,000 fine__

-----------------------------------------------------------------
=================================================================

Count #: 7-10

18 USC §§ 1343 and 1346 and 2, Mail fraud

Max. Penalty: __5 years' imprisonment; $250,000 fine__

=================================================================

\*This is merely a preliminary estimate of the maximum
possible incarceration.  It does not include any other
possible consequences including but not limited to fine,
special   assessment,   restitution,   special   parole,
probation, supervised release, etc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET*

# 98-0003 CR-UNGARO-BENAGES

Defendant Name: James Burke continued _____ Case No.:_____

Count #: 11 and 12                    MAGISTRATE JUDGE
18 USC § 1956(a)(2) and 2, Money laundering DUBÉ

Max. Penalty: 20 years' imprisonment, $500,000 fine

==========================================================

Count #:

Max. Penalty:

==========================================================

Count #:

Max. Penalty:

==========================================================

Count #:

Max. Penalty:

==========================================================

*This is merely a preliminary estimate of the maximum
possible incarceration.  It does not include any other
possible consequences including but not limited to fine,
special assessment, restitution, special parole,
probation, supervised release, etc.

UNITED STATES DISTRI␣   COURT
SOUTHERN DISTRICT OF FLORIDA

**PENALTY SHEET**\*

# 98-0003 CR - UNGARO - BENAGES

Defendant Name: _Billy Hardemon_____   Case No.:_____

---

Count #:   1      **MAGISTRATE JUDGE**
                              **DUBÉ**
18 USC §371, Bribery and money laundering conspiracy_____

Max. Penalty:  __5 years' imprisonment; $250,000 fine__

===============================================================

Count #:  3
18 USC §666(a)(1)(B), Bribery

Max. Penalty:  __10 years' imprisonment; $250,000 fine__

===============================================================

Count #: 7-10
18 USC § 1343 and 1346 and 2, Mail fraud

Max. Penalty:  __5 years' imprisonment; $250,000 fine__

---------------------------------------------------------------

===============================================================

Count #:11
18 USC § 1956(a)(2)(A) Money laundering

Max. Penalty:  ___20 years' imprisonment; $500,000 fine__

---

===============================================================

\*This is merely a preliminary estimate of the maximum
possible incarceration.  It does not include any other
possible consequences including but not limited to fine,
special assessment, restitution, special parole,
probation, supervised release, etc.

UNITED STATES DISTRI    COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET*

98-0003  CR-UNGARO-BENAGES

Defendant Name.  Calvin Grigsby                    Case No.:_____

MAGISTRATE JUDGE
DUBÉ

Count #: 1

18 USC § 371, Bribery and money laundering conspiracy

Max. Penalty:  5 years imprisonment; $250,000 fine

=================================================================

Count #:  4

18 USC §666(a)(2), Bribery

Max. Penalty:  10 years' imprisonment; $250,000 fine

=================================================================

Count #: 7-10

18 USC §§ 1343 and 1346 and 2, Mail Fraud

Max. Penalty:  5 years' imprisonment; $250,000 fine

=================================================================

Count #:  11

18 USC §1956(a)(2)(A), Money laundering

Max. Penalty:  20 years imprisonment; $500,000 fine

=================================================================

*This is merely a preliminary estimate of the maximum
possible incarceration.  It does not include any other
possible consequences including but not limited to fine,
special  assessment,  restitution,  special  parole,
probation, supervised release, etc.

FGJ 96-06 (MIA)
INDICTMENT NO. PC 9606-18

FORM DBD-34
JUN #5

98-0003 CR-UNGARO-BENAGES

MAGISTRATE JUDGE
DUBÉ

# UNITED STATES DISTRICT COURT

SOUTHERN  District of  FLORIDA

CRIMINAL  Division

## THE UNITED STATES OF AMERICA

vs.

JAMES BURKE, CALVIN GRIGSBY,

BILLY HARDEMON

# INDICTMENT

18 USC §371
18 USC §666
18 USC §1956(a)(2)(A)
18 USC §§1343, 1346 and 2

A true bill.

_____
Foreman

Filed in open court this _____

of _____ A.D. 19 98

_____ day.

_____
Clerk

Bail $ _____

## BOND RECOMMENDATION

**DEFENDANT**  Billy Hardemon

$ 500,000    (Personal Surety), Recognizance, Corp. Surety, Cash)
(Jail) (On Bond) (Warrant) (Summons) (Marshal's
Custody)

**ASSISTANT UNITED STATES ATTORNEY**
MARY K. BUTLER

**Last Known Address:**

**What Facility:**

**Agent:**    Special Agent Allen Lane
(FBI) (SECRET SERVICE) (DEA) (IRS) (CUSTOMS) (OTHER)

98-3 cr 003

## BOND RECOMMENDATION

**DEFENDANT**    Calvin Grigsby

$ 1,000,000    (Personal Surety), Recognizance, Corp. Surety, Cash)
(Jail)  (On  Bond)  (Warrant)  (Summons)  (Marshal's
Custody)

**ASSISTANT UNITED STATES ATTORNEY**
MARY K. BUTLER

**Last Known Address:** _____

_____

**What Facility:** _____

**Agent:**    SPECIAL AGENT ALLEN LANE
(FBI) (SECRET SERVICE) (DEA) (IRS) (CUSTOMS) (OTHER)

## BOND RECOMMENDATION

DEFENDANT     James Burke
_____

$ __500,000__     (Personal Surety), Recognizance, Corp. Surety, Cash)
                  (Jail) (On Bond) (Warrant) (Summons) (Marshal's
                  Custody)

_____
ASSISTANT UNITED STATES ATTORNEY
Mary K. Butler

Last Known Address: _____

                    _____

What Facility:      _____

Agent:              Special Agent Allen Lane
                    _____
                    (FBI) (SECRET SERVICE) (DEA) (IRS) (CUSTOMS) (OTHER)